# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued May 5, 2008                    Decided June 13, 2008

No. 06-3183

UNITED STATES OF AMERICA,
APPELLEE

v.

GREGORY HURT,
APPELLANT



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED   JUN 1 3 2008
CLERK

---

Appeal from the United States District Court
for the District of Columbia
(No. 05cr00418-01)

---

FILED

AUG - 7 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*Hesham M. Sharawy*, appointed by the court, argued the cause for appellant. With him on the briefs was *Douglas J. Behr*, appointed by the court.

*Amanda J. Williams*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese III*, *Elizabeth Trosman*, and *Michael Atkinson*, Assistant U.S. Attorneys.

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

2

GRIFFITH, *Circuit Judge*: A jury found Gregory Hurt guilty of theft of government property under 18 U.S.C. § 641. On appeal, Hurt challenges the jury instructions and his trial counsel's performance in shaping them. Seeing no reversible error, we affirm the judgment of conviction

## I.

Hurt developed Post-Traumatic Stress Disorder after serving in the Vietnam War. On December 19, 2002, the Department of Veterans Affairs ("VA") determined that Hurt was entitled to a benefits award of $243,500.10, dating back to the first manifestation of his disability in 1983. Because Hurt had already received $9,140.00 in benefits, the VA owed him $234,360.10. Hurt took his lump-sum award in a series of checks. The first check, dated January 3, 2003, was for $99,999.10; the second check, dated February 6, 2003, was for $99,999.00; the third check, dated February 12, 2003, was for $34,362.00. Upon receipt, Hurt negotiated each of the checks and deposited the funds in his account at Andrews Federal Credit Union ("AFCU").

Between April and July of 2003, Hurt went to the VA on several occasions to lodge a pair of grievances about the amount of benefits he had received: one having to do with benefits for his wife, the other with a supposedly missing check. During these visits, he met with a benefits counselor named Diana Hannah. Hurt complained that the VA's calculation of his benefits award had not included his wife as a dependent. Hannah explained that Hurt had provided insufficient marriage documentation, an error Hurt was invited to fix by submitting additional information. Hurt also complained he had not received the $99,999.10 check. When Hannah informed Hurt that he would have to fill out certain forms before the VA could send a replacement check, he

3

demanded to speak with supervisor James Wear. Using the
VA's computerized records, Wear was able to determine that
all three checks had been sent to Hurt, but he could not tell
whether Hurt had received and negotiated them. Hurt insisted
that he had not gotten the $99,999.10 check and Wear,
sympathetic to what he thought was a veteran in need,
relented. Forgoing the usual paperwork, Wear directed a VA
finance clerk named Bruce Britton to send a replacement
check to Hurt for $99,999.10, which he did on July 28, 2003.
On July 31, 2003, Hurt negotiated this fourth check and
deposited the full amount into his AFCU account.

The fourth check was more than Hurt was owed because
he had not actually missed any checks. The VA soon realized
its slip-up. After running a tracer on the four checks, Britton
learned that Hurt had negotiated the supposedly missing first
check just a few days after its issuance. On August 5, 2003,
Britton sent Hurt a letter demanding the return of the VA's
mistakenly issued $99,999.10 replacement check. Hurt did not
return any money. Instead, on August 14, 2003, Hurt moved
$160,000 from his AFCU account to a new account at
SunTrust Bank. On August 21, 2003, Britton sent Hurt
another letter explaining that he must either return the funds
or have his future VA benefits garnished. Hurt still did not
return the $99,999.10 the VA had overpaid.

A grand jury returned an indictment against Hurt on the
charge of theft of government property, 18 U.S.C. § 641, as
well as related theft charges under local law that were later
dismissed. Hurt was tried before a jury in the United States
District Court for the District of Columbia. The government
put on several witnesses and argued that Hurt had committed
theft either through stealing the fourth check by falsely
claiming he had not received the first check, or else through
knowingly converting the fourth check by acting to deprive

4

the government of the mistakenly disbursed funds. The
defense, which did not call Hurt or any other witness to the
stand, argued that Hurt had a good faith belief that the fourth
check amounted to spousal benefits and therefore belonged to
him.

Counsel clashed over the instructions the jury would
receive. The district court ultimately instructed the jury it
could only convict Hurt of theft of government property if the
government had proved beyond a reasonable doubt that the
money had a value of more than $1,000; that the money
belonged to the United States; and that Hurt took the money
knowing it was not his and with the intent to deprive the
owner of the use or benefit of the money. The district court
further explained that the government could prove theft of
government property by stealing or by knowing conversion.

The unanimous jury found Hurt guilty of theft of
government property. Hurt moved for a new trial, arguing that
the jury instructions were flawed. The district court denied the
motion and sentenced Hurt to imprisonment for time served
plus twelve days; supervised release for a period of three
years; a special assessment of $100.00; and restitution in the
amount of $99,999.10. Hurt appeals. We have jurisdiction
under 28 U.S.C. § 1291.

## II.

Hurt's first argument concerns the district court's refusal
to deliver a requested theory-of-defense instruction. Theft of
government property under 18 U.S.C. § 641 is a specific
intent crime. *See Morissette v. United States*, 342 U.S. 246,
270–76 (1952); *United States v. Rhone*, 864 F.2d 832, 836
(D.C. Cir. 1989); *United States v. Baker*, 693 F.2d 183, 186
(D.C. Cir. 1982). As such, a thief under § 641 is one who

5

takes property knowing it belongs to another with an intent permanently to deprive the owner of possession. A person who harbors a good faith but mistaken belief that property belongs to him lacks the necessary *mens rea* for theft. *See* 3 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 19.5(a) (2d ed. 2003); *cf. Richardson v. United States*, 403 F.2d 574, 575–76 (D.C. Cir. 1968) (holding that a defendant cannot be convicted of robbery, a specific intent crime, if he believed himself entitled to the money taken). Hurt asked the district court to deliver a theory-of-defense jury instruction explaining that he could not be convicted if he had a good faith but mistaken belief that the fourth check belonged to him. The district court refused this request, explaining that there was no evidence to support such an instruction because Hurt had not testified as to his state of mind. We review de novo this failure to provide a requested jury instruction. *United States v. Perkins*, 161 F.3d 66, 69 (D.C. Cir. 1998).

The district court asked too much of Hurt in rejecting his request. A theory-of-defense instruction is in order if there is " 'sufficient evidence from which a reasonable jury could find' " for the defendant on his theory. *United States v. Glover*, 153 F.3d 749, 754 (D.C. Cir. 1998) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)). There was sufficient evidence presented at trial from which a reasonable jury could have found that Hurt had a good faith belief that the fourth check was his. Hannah, the VA benefits clerk, testified that Hurt had attempted to secure benefits for his wife and subsequently received a check. Hannah's testimony is not direct evidence of Hurt's state of mind, but courts often infer state of mind on the basis of circumstantial evidence. Indeed, it was on the basis of such inference that Hurt was convicted of theft, a specific intent crime, without taking the stand. *See United States v. Schaffer*, 183 F.3d 833, 843 (D.C. Cir. 1999) ("[A]s with most cases in which the defendant's state of mind

6

is at issue, it may be near impossible to establish the requisite *mens rea* through direct evidence. In the absence of any specific statement or other contemporaneous documentation of the defendant's subjective motivation, the trier of fact can do no more than ascribe an intent on the basis of the circumstances surrounding the defendant's actions."). The inference from the Hannah testimony is straightforward. Hurt complained to Hannah that he deserved compensation for his wife, submitted the VA's required documentation, and shortly thereafter received a check from the government that bore no mention of its purpose. One could reasonably infer that Hurt had a good faith belief that the fourth check belonged to him as a benefits award to cover his wife. Sufficient evidence supported the rejected instruction.

Hurt's victory is fleeting, however, because the district court's mistaken refusal of the requested instruction does not require reversal. "As a general rule, the refusal to give an instruction requested by a defendant is reversible error only if the instruction . . . was not substantially covered in the charge actually delivered to the jury . . . ." *United States v. Taylor*, 997 F.2d 1551, 1558 (D.C. Cir. 1993) (citation and quotation marks omitted). Taking the instructions as a whole, *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *United States v. Whole*, 925 F.2d 1481, 1485 (D.C. Cir. 1991) (Thomas, J.), our task is to determine whether the trial court adequately conveyed the substance of the requested instruction to the jury.

We conclude that the district court did so. The court stressed to the jury that theft of government property is a specific intent crime, explaining that the government must prove beyond a reasonable doubt "that the defendant stole the money knowing that it was not his, and with the intent to deprive the owner of the use or benefit of the money," and that "if you believe that Mr. Hurt was unsure about the true

7

ownership of the money . . . then you must acquit him of the crime of theft of government property." These instructions substantially covered the same ground that Hurt requested in his proposed instruction. The district court made abundantly clear that the jury must acquit Hurt if they believed that he had a good faith but mistaken belief that the money was his. A new trial is unwarranted. *See United States v. Gambler*, 662 F.2d 834, 837 (D.C. Cir. 1981) ("A review of the instructions . . . reveals that the trial court took care to emphasize the Government's burden of proving the element of specific intent beyond a reasonable doubt. We believe that these instructions sufficiently covered the particular point raised by appellant's requested 'good faith' instruction.") (citations omitted), *United States v. Butler*, 822 F.2d 1191, 1197–98 (D.C. Cir. 1987) ("[T]he jury instructions here, which stressed that the government was required to prove that defendants acted with specific intent to defraud others, were adequate without an additional instruction on the good faith defense.").

### III.

There are two ways Hurt could have committed theft of government property: he could have stolen the VA's check, or he could have knowingly converted the funds. *See* 18 U.S.C. § 641 (listing "[w]hoever embezzles, steals, purloins, or knowingly converts to his use or the use of another . . . any record, voucher, money, or thing of value of the United States or of any department or agency thereof"). Hurt's second argument targets the district court's omission of a special unanimity instruction requiring that all twelve jurors agree how the theft took place. On this view, conviction under § 641 would be improper if, say, six jurors believed that Hurt stole the money by lying to the VA about the missing check and six jurors believed that he knowingly converted the funds by moving them to prevent their retrieval. Hurt leans heavily

8

on our dicta in *United States v. Mangieri*, 694 F.2d 1270 (D.C. Cir. 1982), and asserts a Sixth Amendment right to a special unanimity instruction.

*Mangieri*, however, actually harms Hurt's cause. It is true that in dicta in that case, we "urge[d]" trial courts to follow the "sensible and appropriate" rule of *Hack v. United States*, 445 A.2d 634 (D.C. 1982), by which a court, *sua sponte*, will give a special unanimity instruction " 'when one charge encompasses two separate incidents.' " *Mangieri*, 694 F.2d at 1281 (quoting *Hack*, 445 A.2d at 641). But in *Mangieri* itself, as here, trial counsel failed to object to the lack of a special unanimity instruction, so our review was only for plain error. And we ultimately concluded that the trial court's failure to give a special unanimity instruction *sua sponte* was not plain error. *Id.* at 1280–81. We reach the same result here.

Hurt misreads the Sixth Amendment, as *Schad v. Arizona*, 501 U.S. 624 (1991), makes clear. In *Schad*, a defendant had been convicted under a first-degree murder statute that defined *mens rea* as either premeditated killing or felony murder. The defendant argued that the trial court was obliged by the Sixth Amendment to give a special unanimity instruction, such that he could not be convicted of first-degree murder based on some jurors voting premeditated killing and others voting felony murder. The Supreme Court affirmed the conviction. Justice Souter, joined by Chief Justice Rehnquist and Justices O'Connor and Kennedy, rejected the idea that the Sixth Amendment requires jury unanimity as to the means by which a crime was committed. *Id.* at 631 (plurality opinion) ("We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission . . . ."). In his separate opinion, Justice Scalia agreed that unanimity as to means is unnecessary. *Id.* at 649–50 (Scalia, J., concurring in the

9

judgment) ("As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. . . . When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her ") (citations omitted). Five Justices agreed in *Schad* that jurors need not reach unanimity as to the means of committing a crime, and where the Court has gone, we have followed. *See United States v. Kayode*, 254 F.3d 204, 214 (D.C. Cir. 2001) (holding that where statute required possession of five false documents, jury need not agree on which five documents were false, citing *Schad*); *United States v. Harris*, 959 F.2d 246, 255 (D.C. Cir. 1992) (holding that where statute required five members of criminal enterprise, jury need not agree on which five people were members, citing *Schad*).

But even as *Schad* rejected a Sixth Amendment argument for a special unanimity instruction, it recognized a related right under the Due Process Clause. The five Justices who agreed means-unanimity is not required also acknowledged a limit to what jury findings can be combined to support a verdict. *Schad*, 501 U.S. at 632–33 (plurality opinion) ("That is not to say, however, that the Due Process Clause places no limits on a State's capacity to define different courses of conduct, or states of mind, as merely alternative means of committing a single offense, thereby permitting a defendant's conviction without jury agreement as to which course or state actually occurred. . . . [N]othing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of 'Crime' so generic that any

10

combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction."); *id.* at 650 (Scalia, J., concurring in the judgment) ("[O]ne can conceive of novel 'umbrella' crimes (a felony consisting of either robbery or failure to file a tax return) where permitting a 6-to-6 verdict would seem contrary to due process."). In sum, the Due Process Clause recognizes a point at which distinct incidents go from being different means of committing the same crime, to being different crimes.

Were we faced with the question whether a conviction under 18 U.S.C. § 641 without a special unanimity instruction violates the Due Process Clause by creating a mishmash of stealing and knowing conversion, our burden in this appeal would be more substantial than it is. But trial counsel's failure to object to the lack of a special unanimity instruction relieves us of that burden, and we review only for plain error. *See United States v. Martinez*, 476 F.3d 961, 970 (D C. Cir. 2007) (citing FED. R. CRIM. P. 52(b)); *United States v. Klat*, 156 F.3d 1258, 1266–67 (D.C. Cir. 1998); *Mangieri*, 694 F.2d at 1280. Attempting to stave off plain error review, Hurt points to two exchanges from the trial that he claims were objections that properly raised the issue for the district court's consideration. The first is as follows:

> [DEFENSE]: Judge, the only one that I can see objecting to in the general instructions is the unanimity instruction on 28.
>
> [THE COURT]: You object to my giving the unanimity instruction?

11

> [DEFENSE]: Well, the way they have it here is "Theft by false pretenses," or "Theft after notice from Government of error" –
>
> [THE COURT]: I'm just going to give the standard unanimity instruction.
>
> [DEFENSE]: Okay, all right.

This is the opposite of an objection. The district court rejected the government's proposed special unanimity instruction in favor of "the standard unanimity instruction," and defense counsel agreed with this choice.

The second supposed objection is as follows:

> [GOVERNMENT]: Do you think that on the unanimity instruction that there ought to be a dual instruction to make sure that the jurors understand that they have to all agree on one theory?
>
> [THE COURT]: Oh, oh, oh. On one theory?
>
> [GOVERNMENT]: Not one theory; but either he stole it or he converted it. I mean, six can't say, we think he stole it, and six say, he converted it and therefore there's a conviction.
>
> [THE COURT]: Do you want me to instruct it that way?
>
> [GOVERNMENT]: I just pose it for your –
>
> [THE COURT]: I think [defense counsel] would be delighted with that one.

12

[DEFENSE]: I'm sorry, if you could just repeat exactly –

[THE COURT]: That's like the conspiracy charge that says you-all have to agree on an overt act.

[GOVERNMENT]: I just don't want the jury to be confused, judge. If you don't think they'll be confused, then I'm happy with the instructions.

[DEFENSE]: I'm fine with the government's change, Your Honor.

[THE COURT]: All right. Well, we'll have to –

[GOVERNMENT]: Your Honor –

[THE COURT]: Yeah?

[GOVERNMENT]: Judge, you know, if you want to — I will withdraw my request. The unanimity instruction –

[THE COURT]: You've rethought it, have you?

[GOVERNMENT]: Well, you know, you have more experience than I do, judge. If you don't think they're going to be confused, then I'll defer to the Court.

[DEFENSE]: Your Honor, there are two other instructions –

13

> [THE COURT]: We may very well get a question
> from the jury on that, and we'll cross that bridge when
> we come to it.

Hurt claims that the prosecutor requested a special unanimity
instruction and withdrew the request, and that defense counsel
joined the request but not the withdrawal. We do not derive as
much from counsel's silence. Hurt's lawyer did not take
ownership of the government's request. He merely said he
was "fine" with it, then said nothing when it was withdrawn.
Defense counsel's actions did not put the district court on
notice of his supposed concern. We are not persuaded that
counsel objected in the trial court to the lack of a special
unanimity instruction. *See United States v. Johnson*, 561 F.2d
832, 854 (D.C. Cir. 1977) ("[T]he issue in determining the
applicability of the plain error rule . . . is whether the issue
was raised by the defense team with sufficient clarity to put
the government and the trial court on notice that the issue had
been raised."); *see also United States v. Schalk*, 515 F.3d 768,
776 (7th Cir. 2008) ("If no objection was made that would put
the district court (and the other party) on notice of the
objecting party's concern, then the standard of review is for
plain error."). Hurt's argument that the district court erred by
not giving a special unanimity instruction was not properly
preserved at trial.

Accordingly, we review for plain error. This standard of
review calls for reversal if "(1) there is an error (2) that is
plain and (3) that affects substantial rights, and (4) we find
that the error 'seriously affects the fairness, integrity or public
reputation of judicial proceedings.' " *United States v.
Baugham*, 449 F.3d 167, 183 (D.C. Cir. 2006) (quoting
*United States v. Olano*, 507 U.S. 725, 732 (1993) (interpreting
FED. R. CRIM. P. 52(b))). We will move to the second point
and dispose of Hurt's argument by showing that the district

14

court's alleged error was by no means "plain," given the debate over special unanimity instructions.

The difficult question under *Schad* is how does a court mark "the point at which differences between means become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses"? *Schad*, 501 U.S. at 633 (plurality opinion). The question is further complicated by the fact that Justices Souter and Scalia parted ways on this matter of establishing "definitional and verdict specificity." *Id.* at 637.

Speaking for a plurality of four, Justice Souter wrote, "appropriate specificity is a distillate of the concept of due process with its demands for fundamental fairness, and for the rationality that is an essential component of that fairness." *Id.* (citation omitted). In applying this approach to *Schad*'s first-degree murder statute, Justice Souter looked to history and current practice among the States as nonbinding indicators of what "we as a people regard as fundamentally fair and rational ways of defining criminal offenses." *Id.* at 640–43. Justice Souter ultimately approved the first-degree murder statute's treatment of premeditation and felony murder as alternative means of committing a single crime, concluding that "the jury's options in this case did not fall beyond the constitutional bounds of fundamental fairness and rationality." *Id.* at 645.

By contrast, Justice Scalia focused on the history of the crime at issue to determine what was *due* under the Due Process Clause. *Id.* at 650 (Scalia, J., concurring in the judgment). On this view, the common law tradition of grouping premeditated killing with felony murder indisputably established that such a grouping in a modern

15

statute was in keeping with fundamental fairness. *See id.* at 648–49. History alone guided Justice Scalia's analysis, and he was critical of the plurality's reliance upon "fundamental fairness" in conducting its inquiry. " 'Fundamental fairness' analysis may appropriately be applied to *departures* from traditional American conceptions of due process; but when judges test their individual notions of 'fairness' against an American tradition that is deep and broad and continuing, it is not the tradition that is on trial, but the judges." *Id.* at 650.

Returning to Hurt's case, let us assume *arguendo* that the district court erred in failing to give a special unanimity instruction as to stealing and knowingly converting. The dispositive question is whether this error was "plain," a term "synonymous with 'clear' or, equivalently, 'obvious.' " *Olano*, 507 U.S. at 734 (citations omitted). "As its name suggests, 'plain error' exists only when the error is 'obvious.' Obviousness is assessed from the perspective of the trial court; the error must be so 'plain' the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Saro*, 24 F.3d 283, 286 (D.C. Cir. 1994) (citations and quotation marks omitted). Given the difficulty inherent in deciding what may fit under the umbrella of a single crime, and given the division among the Justices as to how to resolve that question, this error could not have been plain to the district court. Do fundamental fairness and rationality require that we treat stealing and knowingly converting as separate offenses? Even if the answer is "yes," that result is not obvious but instead depends on a mix-and-match examination of practice among the States, common law history, and certain factors left undefined in *Schad*'s plurality opinion. Neither the Supreme Court nor this court has spoken to the issue, and we have no occasion to do so today, so Hurt cannot prevail. *United States v. Whren*, 111 F.3d 956, 960 (D.C. Cir. 1997)

16

("If there is no clear legal rule — whether expressed in a prior
decision or elsewhere — governing an issue, then the district
court's decision cannot be a plain error."). The district court
did not *plainly* err in failing to deliver a *sua sponte* special
unanimity instruction. *Mangieri*, 694 F.2d at 1280–81.

## IV.

Anticipating our conclusion that trial counsel did not
object to the omission of a special unanimity instruction, Hurt
argues in the alternative that his lawyer's performance
abridged his Sixth Amendment right to effective assistance of
counsel as that right has been explained in *Strickland v.
Washington*, 466 U.S. 668 (1984). We may address such an
argument on direct appeal, without remanding to the district
court, if trial counsel's effectiveness or incompetence can be
established on the basis of the trial record. *United States v.
Henry*, 472 F.3d 910, 914–15 (D.C. Cir. 2007). To establish a
successful claim under *Strickland*'s "familiar two-step
framework," a defendant must prove that counsel's
performance fell below an objective standard of
reasonableness under prevailing professional norms, and that
this error caused prejudice. *United States v. Hughes*, 514 F.3d
15, 17 (D.C. Cir. 2008) (citing *Strickland*, 466 U.S. at 687–
88, 694). As a general matter, the bar of objective
reasonableness is set rather low. *See Strickland*, 466 U.S. at
687 (requiring "errors so serious that counsel was not
functioning as the 'counsel' guaranteed the defendant by the
Sixth Amendment"); *Yarborough v. Gentry*, 540 U.S. 1, 8
(2003) (per curiam) ("The Sixth Amendment guarantees
reasonable competence, not perfect advocacy judged with the
benefit of hindsight.").

Hurt argues that trial counsel committed unreasonable
error by failing to adopt the prosecutor's proposed special

17

unanimity instruction. On Hurt's reading of *Strickland,* an objectively reasonable attorney would have avoided plain error review by requesting such an instruction. We reject this argument. Appellate counsel has not convinced us that trial counsel overlooked a valid *Schad* claim for a special unanimity instruction. But even if there was such a mistake, it is not the sort of serious blunder that will singlehandedly support a *Strickland* claim. To lodge a *bona fide* objection on the special unanimity point, trial counsel would first have to satisfy himself that the law was on his side The objective standard of reasonableness does not compel counsel to request a jury instruction to which his client is not entitled. *See United States v. Trejo,* 136 F.3d 826, 828 (D.C. Cir. 1998) (per curiam); *United States v. Debango,* 780 F.2d 81, 85 n.2 (D.C Cir. 1986). A perfect lawyer with unlimited resources might have made a careful study of this difficult area of law, read the tea leaves, and lodged whatever objection his reading of the *Schad* opinions might fairly support. The Sixth Amendment, however, does not pledge perfection. *Yarborough,* 540 U.S. at 8; *Arroyo v. United States,* 195 F.3d 54, 55 (1st Cir. 1999) (Boudin, J ) ("Under [*Strickland*], counsel is not incompetent merely because he may not be perfect. In real life, there is room not only for differences in judgment but even for mistakes, which are almost inevitable in a trial setting, so long as their quality or quantity do not mark out counsel as incompetent."). Had trial counsel neglected a jury instruction to which his client was obviously entitled, our conclusion might be different. But there is little that is obvious about special unanimity instructions, as evidenced by our refusal to find plain error in the district court's omission of such an instruction. It would be unduly harsh to brand the bar incompetent for failing to grasp that which eludes the bench.

18

"[T]he purpose of the effective assistance guarantee of the Sixth Amendment . . . is simply to ensure that criminal defendants receive a fair trial." *Strickland*, 466 U.S. at 689. Hurt received a fair trial, his lawyer's failure to object notwithstanding, so he cannot prevail on his *Strickland* claim.

## V.

For the foregoing reasons, the judgment of conviction is

*Affirmed.*